
RECEIVED

OCT 2 8 2019

DEBORAH S. HUNT, Clerk

IN THE UNITED STATES CIRCUIT COURT FOR THE SIXTH CIRCUIT

Case No 19-6019

JOHN DOE, 18-471

      Plaintiff - Appellant

and

JOHNSON DOE, I; JOHNSON DOE, II; JOHNSON DOE, III

      Plaintiffs

v.

STATE OF TENNESSEE;

WILLIAM BYRON LEE, in his official capacity as the Governor of the State of Tennessee;

HERBERT H. SLATERY, III, in his official capacity as the Attorney General of the State of Tennessee;

DEBORAH TAYLOR TATE, in her official capacity as the Administrator of State Court of the State of Tennessee;

JANE DOE;

KIRK VANDIVORT;

REYNOLDS, POTTER, RAGAN & VANDIVORT, PLC;

CRAIG MONSUE, in his official capacity as Judge of Dickson County General Sessions Court;

DAVID WOLF, in his official capacity; as a Chancellor of the Dickson County Chancery Court;

DICKSON COUNTY CHANCERY COURT;

DICKSON COUNTY GENERAL SESSIONS COURT

Defendants -- Appellees.

---

## BRIEF OF APPELLANT

On Appeal from the U.S. District Court for the Middle District of Tennessee,

Case No 3:18CV471

John Doe, Pro Se
JohnDoePlaintiff@gmail.com

1

**Facts**

The marriage of John Doe and Jane Doe produced three sons, Johnsons Doe I, II, & III. Amended Complaint, Doc #22, PageID# 248, ¶ 2. During the marriage, John Doe was often a stay at home parent to his sons. *Id.* PageID# 251, ¶ 26. As the Doe marriage deteriorated in late 2017 and January 2018, John Doe exhibited acute symptoms of depression. *Id.* at PageID# 251, ¶ 26. Specifically, lack of energy, lack of social engagement, anger outbursts, and suicidal ideation, culminating in John Doe's hospitalization February 1-5, 2018. *Id.* ¶27. The hospitalization resulted in John Doe being treated with medication and he showed immediate improvement. *Id.* and *Id.* at PageID# 256 ¶62. The conduct of the parties between February 5-March 2, 2019 indicates that Jane Doe sought a protective order only when John Doe became set on seeking a divorce. *Id.* PageID# 251, ¶28-31; PageID# 259, ¶ 76; PageID# 270 ¶146-147.

Jane Doe sought a domestic abuse order of protection requiring John Doe to have no contact with her and the Doe children. *Id.* PageID# 251, ¶31; Jane Doe met with John Doe on February 28, 2018 in person, two days after she had first unsuccessfully attempted (the judge was out of town) to obtain an *ex parte* order of protection. *Id.* In her protective order petition, Jane Doe made allegations of potential child abuse, which have never been independently validated by any child protection or law enforcement agency. *Id.* PageID# 251, ¶32-35; Her petition for protective order primarily focused on John Doe's supposed mental health instability, specifically symptoms and treatment for depression. Based on her March 2, 2018 petition, Hon. Craig Monsue, judge of the Dickson County General Session Court, issued an *ex parte* order of protection until a hearing could be had. *Id.* PageID# 251, ¶31;

A hearing was had on March 21, 2018 before the Hon. Craig Monsue; This hearing was audio recorded. *Id.* PageID# 253, ¶ 43-44. At that time, Jane Doe called three witnesses

2

primarily or solely to testify about John Doe's suicidal ideation on January 31, 2018. Id. at ¶40. Jane Doe testified as well. *See Id.* at PageID#254,¶ 46(referencing Jane Doe's testimony.) In summation, Jane Doe's attorney argued Jane Doe was fearful because she didn't have access to John Doe's mental health records and went on to compare John Doe and his depression to a rabid dog that needed to be checked out. *Id.* at PageID#252-253, ¶ 39. Considering all of this testimony about John Doe's depression, Hon. Judge Craig Monsue issued anorder of protection preventing John Doe from having contact with Jane Doe, and the Doe children. *Id.* at PageID# 253 ¶43. In issuing the "no contact"order, Defendant, Judge Monsue specifically said he was not making a custody or placement decision, but was deferring that to the Dickson County Chancery Court, where John Doe had filed for divorce on March 8, 2018. *Id.* and *Id.* at PageID#252, ¶37.

On March 26, 2018, John Doe filed a *de novo* review of the protective order in the Dickson County Chancery Court, along with a motion for a temporary visitation order. *Id.* at PageID# 254, ¶45. The case was called on April 24, 2018 and instead of a temporary order hearing, Judge Wolfe instructed the parties to go to the hallway and negotiate supervised visitation. *Id.* at PageID#254, ¶50. Upon returning and trying to object to Jane Doe's dictated conditions, Judge Wolfe instructed that John Doe was not going to get any visitation that day except by agreement of the parties. *Id.*

John Doe had no contact with his children for 69 days as a result of the "no contact" orders issued because of the symptoms and treatment of his depression. *Id.* at PageID#258 ¶73.

On April 24, 2018, having appointed a guardian ad litem and ordered a psychological evaluation, Judge Wolfe adjourned the issue of a temporary hearing indefinitely. *Id.* at PageID#255, ¶54. On August 3, 2018, the case was adjourned for a temporary hearing on August 10. *Id.* at PageID#257 ¶63-65. The matter was originally scheduled for the entire day;

however, after seven witnesses had been dismissed to the hallway and John Doe had called Jane Doe adversely, only then Judge Wolfe indicated that the focus of the hearing was John Doe's mental health, that the diagnosis concerned him, and that John Doe would have to prove he was not a danger to his children. *Id.* at PageID#257 ¶66. Further at this hearing Judge Wolfe said he would not regard the Americans with Disabilities Act (ADA) as applicable in his court until some other Tennessee court says it applies. *Id.* at ¶65. He further waived the Rule 35 report and said to John Doe, "You've got a lot of diagnoses here." *Id.* at ¶67.

Because there was no court reporter present and there is no routine audio recording in the Dickson County Chancery Court, verbatim contemporaneous records of the April 24, August 3, August 10 hearings do not exist. *Id.* PageID# 259, ¶78;

The Amended Complaint in this action followed.

### Procedural History

John Doe offered the Amended Complaint (Doc #23, PageID# 247-273) on August 14, 2018, with it being accepted for filing on October 5, 2018. The suit also names his three sons as Plaintiffs. *Id.* at PageID#248, ¶2. John Doe moved for appointment of a guardian ad litem to represent his minor children on October 12, 2018. Doc #30, PageID#309-310 (denied as moot July 12, 2019).

John Doe seeks a declaratory judgement that the Tennessee protective order statute, specifically Tenn. Code 36-6-606(a)(1), cannot legally result in an order that the respondent have no contact with his children, as a matter of state statutory interpretation. Claim #1, Doc. 23 at PageID# 259-262, ¶80-98. In the alternative, John Doe seeks a declaratory judgment that the statute is unconstitutional, as vague or because the preponderance of the evidence standard

applicable at a Tennessee domestic abuse protective order hearing provides insufficient due process (primarily a substandard evidentiary burden) Claim#2, *Id.* at PageID#262-63, ¶¶99-103.

Further, John Doe seeks declaratory judgment that the Tennessee custody statute, Tenn. Code § 36-6-106(8), violates Title II of the ADA, on its face, (Claim #3) or as applied (saving construction) (Claim #4). *Id.* at. PageID#263-66, 104-120. Likewise, John Doe seeks declaratory judgment that imposition of a Rule 35 examination fee and supervision costs is an illegal surcharge on his disability, in violation of Title II of the ADA. Claim #5, *Id.* at PageID#266-267, ¶121-125.

John Doe also seeks monetary damages on behalf of himself (Claim #6) and his children (Claim #7) for the intentional disability discrimination he and his children were subjected to by the State of Tennessee; Judge Monsue and Wolfe, acting in an official capacity; and the county and state courts, respectively. *Id.* at PageID#267-269, ¶126-134.

In addition, in bringing her protective order petition, Jane Doe was seeking to improperly gain an advantage in the impending divorce proceedings and thus John Doe has brought a state law claim for abuse of process. Claim #9, *Id.* at PageID#270-71, ¶142-153.

As an ancillary to these issues, John Doe notes that a contemporaneous verbatim record was not taken by the Dickson County Chancery Court at material times, as permitted by state practice. *Id.* at PageID#259, ¶78. Therefore, John Doe seeks a declaratory judgment that the state's failure to take a routine contemporaneous verbatim record in state "courts of record" violates 14th Amendment due process. Claim #10, *Id.* at Page ID#271-273, ¶154-164.

While this case was pending in the United States District Court for the Middle District of Tennessee, John Doe sought a temporary restraining order and a preliminary injunction to restore the his illegally deprived parenting rights while this case was pending. Doc # 51 and 57.

Ultimately, John Doe withdrew those motions (after the state court had restored contact between John Doe and the children); the district court had taken no action regarding this deprivation of the sacrosanct fundamental liberty interest. Doc # 109.

Claims brought against Jane Doe's former lawyer and law firm were dismissed by agreement. In addition, John Doe intends to abandon Claim #8, violation of Due Process against Jane Doe, as well. John Doe also no longer seeks relief voiding state court orders, as the state orders at issue are no longer currently in effect.

The District Court dismissed John Doe's case on July 12, 2019, based upon the domestic relations exception to federal court jurisdiction. *See generally* Magistrate Report and Recommendation, Doc. #112; *Affirmed* Doc #117.

Shortly thereafter, John Doe discovered that the wife of the assigned district court judge is employed as the head of the legal office serving the Tennessee General Assembly. Aff. in Support of Motion for Recusal, Doc. #119, Att 1, PageID#777, ¶3. In that role, the district court judge's wife oversees the office advising the General Assembly as to the legality, enforceability, and legal effects of its enactments. *Id.* at PageID# 777-778, ¶4. On that basis, John Doe filed for recusal and reconsideration, which was denied. Doc #119 and Doc #121. In denying the motion the district court noted that the judge's wife has not directly worked on the statutes at issue. Order Denying Motion for Recusal, Doc#121, PageID#782.

John Doe then brought this appeal.

## ISSUES PRESENTED

**1. Does jurisdiction properly lie in the Federal Courts?**

**District Court:** No, because this matter presents a controversy barred by the domestic relations exception.

6

**Appellant:** Yes. This matter is not barred by the very narrow domestic relations exception and there is no basis for abstention.

2. **Does this suit require dismissal on the basis of recognized immunities?**

   **District Court:** The issue was mooted by the District Court's ruling on the Domestic Relations exception.

   **Appellant:** No, dismissal is not warranted as absolute immunity and qualified immunity do not apply in this context.

3. **Does the Amended Complaint state a prima facia case?**

   **District Court:** This issue was mooted because of the District Court's holding regarding the domestic relations exception.

   **Appellant:** Yes.

4. **Should the matter be reassigned up on remand?**

   **District Court:** No, the District Court denied a Motion for Recusal.

   **Appellant:** Yes, there is a clear basis for recusal or, in the alternative, a clear basis for supervisory reassignment by this Court.

**ARGUEMENT**

I.    **JURISDICTION PROPERLY LIES IN THE FEDERAL COURTS.**

"Chief Justice Marshall famously cautioned: 'It is most true that this Court will not take jurisdiction if it should not: but it is equally true, that it must take jurisdiction if it should…We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given.'" *Marshall v. Marshall,* 547 US 293, 298-99 (2006), *quoting Cohens* v. *Virginia,* 6 Wheat. 264, 404 (1821).

### A. The Domestic Relations Exception Does Not Apply Because John Doe is Not Seeking Relief Which Would Implicate the Doctrine.

The domestic relations exception is a non-constitutional judicial doctrine which prohibits the federal courts from granting divorces, making custody orders, and awarding alimony or child support. *Akenbrandt v. Richards,* 504 U.S 689, 703-04 (1992). *Catz v. Chalker,* 142 F.3d 279 (6th Cir. 1998), *abrogated on other grounds by Coles v. Granville,* 448 F.3d 853, 859 n. 1 (6th Cir. 2006). John Doe did not expressly seek such relief.[1] In dismissing for want of jurisdiction, the district court said that though John Doe did not expressly seek the verboten relief, it is what John Doe *really* sought. Magistrate Recommendation, Doc #112, PageID#716-17 ("[A]t the core of each and every claim is a request that this Court *modify* the protective and child-custody orders issued in his state-court divorce and custody proceedings... Because this case is, at heart, Doe's attempt to modify the state court's child-custody orders, this Court lacks subject-matter jurisdiction.")

However, implied motive does not evoke the domestic relations exemption as the Circuit has made abundantly clear previously. *Alexander v. Rosen,* 804 F.3d 1203, 1205-1206 (6th Cir. 2015). Further, the district court implied *motives* and facts in favor of dismissal, but the opposite is generally required. *Compare* Magistrate Recommendation, Doc #112, PageID#716-17 *with Scheuer v. Rhodes,* 416 US 232, 236 (1974) ("...it is well established that, in passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for

---

[1] John Doe's Amended Complaint did seek to *invalidate* a state "no contact" order, which the judge making the order pronounced to not be a custody determination. It also sought to have the state courts enter a temporary order by default, a procedural application, not one on the merits. Seeking to invalid orders has not been held as a basis to invoke the domestic relations exception. *Catz,* 142 F.3d. at 291; *Alexander v. Rosen,* 804 F.3d 1203, 1206 (6th Cir. 2015). Regardless, this requested relief is now moot.

8

failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader.")

Further, the District Court relied on pre-*Ankenbrandt* case law and a misleading 2015 district court case. PageID#715-16. This Circuit has repeatedly laid out the proper course, post *Ankenbrandt*:

> "It is true that Alexander asks us to "abate[]" his child support payments...But just as *Catz's* request that we nullify his divorce did not prevent us from taking jurisdiction...Alexander's desired relief does not alter the character of his case, which presents standard questions of federal conspiracy and civil rights law."

*Alexander v. Rosen*, 804 F.3d 1203, 1206 (6th Cir. 2015), internal citation to *Catz*, 142 F.3d. at 291 omitted, (emphasis added).

The domestic relations exception is clearly not implicated by John Doe's Amended Complaint and the district court judgment is in clear error, such that the Appellants cannot defend the district court ruling in good faith, given the Circuit's precedents.

## B. The domestic relations exception does not apply to federal claims or to these federal claims.

The domestic relations exception has sometimes been called, "the 'domestic relations' exception to diversity jurisdiction." *Akenbradt*, 504 U.S at 692. In fact, it is recognized that as a non-constitutional, judicially created doctrine, stemming from interpretation of jurisdictional statutes, and that the domestic relations exception may be defeated by statute. *Id.* at 700. Arguably, the exception should apply equally to supplemental jurisdiction, as well as diversity jurisdiction.

9

However, under no circumstance should the domestic relations exception be held to defeat a claim arising under federal law or for deprivation of a fundamental liberty interest. Federal question cases arise from statues. Statutes conferring jurisdiction trump the non-constitutionally-based, judicially-created, domestic relations exception. The domestic relations exception has been limited to those cases where the plaintiff asks the federal court for a divorce, custody determination, or an award of alimony or child support. John Doe is not aware of any federal statutory action which would permit any such relief prohibited by the domestic relations exception.

It is conceivable that a domestic relations litigant could construe any perceived state court wrong into a due process violation, but the federal remedy for such a violation may properly be voiding a state court order and ordering a new hearing in state court, not making a merits determination.

While other sister circuits have recognized that the domestic relations exception does not apply to suits arising under federal claims, this Circuit has not yet so held. See discussion The troubling dismissal of John Doe's federal statutory and constitutional claims, which implicate the *sacrosanct* fundamental liberty of the parent-child relationship on a discriminatory basis prohibited by statute, provides solid factual, procedural, and policy bases for this Court to join its sister circuits in curtailing the overbroad application of this doctrine in the district courts.

In this case, this overbroad application of the doctrine resulted in a litigant clearly entitled to relief figuratively having the courtroom door slammed in his face, after waiting for months to be heard. Federal rights and statutes should not be curtailed because family law is involved; the rights affecting and surrounding the family have always been recognized as fundamentally

protected. How is it possible that Title II of the ADA can abrogate state sovereign immunity, but not the judicially created domestic relations exception?

### C. *Younger* abstention is not appropriate.

The district court did not reach the issue of *Younger* abstention. However, the issue is still appropriate to be addressed on appeal, as it pertains to the Court's subject matter jurisdiction, an issue which is never waived. Therefore, the matter should be addressed and quickly dispatched.

*Younger* abstention, originating with *Younger v. Harris,* 401 U.S. 37 (1971), is a doctrine that prohibits a federal court from hearing certain types of cases when a related state case is also pending involving the Plaintiff, specifically criminal cases, civil cases in which the state is a party, and cases involving state appellate bonding and state court contempt. *Sprint Communications Inc. v. Jacobs,* 571 U.S. 69; 134 S.Ct at 588, 591, 593-94 (2013), *citing New Orleans Public Service, Inc. (NOPSI) v. Council of City of New Orleans,* 491 US 350, 368 (1989). *See also FCA US, LLC v. Spitzer Autowald Akron, LLC* 887 F.3d 290 (6th Cir 2018), *and Doe v. University of Kentucky,* 860 F.3d 365, 369 (6th Cir. 2017). *Younger* applies where the underlying state case is one of these, "but no further." *Sprint Communications Inc v Jacobs,* 571 U.S. at 594.

The state case here, by its category, does not implicate *Younger* abstention. In fact, the 9th Circuit affirmatively declared last year that *Younger* abstention does not apply to a pending state family law case. *Cook v. Harding,* 879 F.3d 1035, 1040 (9th Cir. 2018) ("We emphasis that federal courts cannot ignore *Sprint*'s strict limitations on *Younger* abstention simply because States have an undeniable interest in family law.") The *Younger* abstention analysis should stop there, with a finding that the underlying divorce case is not of a type that implicates the doctrine.

11

However, there is further basis to dispatch with *Younger* abstention. John Doe is suing for intentional discrimination in violation of Title II of the ADA, a claim for which state sovereign immunity has been abolished. 42 U.S.C. § 12202. *See also Tennessee v Lane,* 541 U.S. 509, 533-34 (2004) and *Popovich v. Cuyahoga County Court of Common Pleas,...,* 276 F.3d 808, 815 (6th Cir. 2002). John Doe is not aware of any instance where a court went on to dismiss based on *Younger* where sovereign immunity had been properly abrogated. Likewise, the remedies are identical for Title II of the ADA as they are under §504 of the Rehabilitation Act. 42 U.S.C. §12133, *referencing* 29 U.S.C. §794a [(a)(2)]. *Olmstead,* 527 U.S. at 590 (1999). *Younger* abstention is clearly obliterated in the §504 context, as the state is treated as having consented to federal court jurisdiction. *See Bd. of Ed. of Oak Park and River Forest v. Kelly E,* 207 F.3d 931, 935 (7th Cir 2002). This is further bolstered by the statutory directive that relief be available to Plaintiffs suing the government as if they were suing a business. 42 U.S.C. §12022. If a non-profit had used a process to discriminate against John Doe, denying him an adoption, review of the non-profit's procedures would not be barred by *Younger*, so too when the state takes away children on the basis of disability discrimination.

In addition, *Younger* is not appropriate when the state courts do not provide a proper jurisdiction or the other matter presented a proper forum for the controversy. In this case, it apparent the state courts are not competent to determine John Doe's ADA claims, as Judge Wolfe expressly deferred "to some other court." Likewise, John Doe cannot fathom suing the State of Tennessee, its offices, or, in an official capacity, state and county judges, in the divorce proceeding.

For all these reasons, *Younger* simply does not apply to this case. Applying *Younger* here would allow the courts of Tennessee to continue to take children from their parents without

providing sufficient due process, discriminate against parents with disabilities, and to do so without keeping verbatim records, all of which infringe federally protected rights.

## II.    THERE ARE NO APPLICABLE IMMUNITIES.

The district court's ruling did not reach the issue of immunity. However, when a defendant claims immunity, such matters are immediately appealable defenses. In the district court, Defendants raised baseless claims of immunity. As a matter of judicial efficiency, if nothing else, these meritless claims should be promptly dispatched now.

Absolute immunity or qualified immunity, as sought by the Defendants in the district court, may apply where a government actor is sued for monetary damages in an *unofficial* capacity. *Harlow v. Fitzgerald*, 457 U.S. 800 (1982). However, no government actor is sued herein in an unofficial capacity.[2] Therefore, absolute and qualified immunities do not apply.

Immunities do not apply to claims brought for declaratory or injunctive relief against state officials acting in their official capacity. *Ex parte Young*, 209 U.S. 123 (1908). Therefore, Claims 1-5, and 10, which seek no monetary relief, do not give rise to claims of immunity.

As to claims 6-7, John Doe is suing for monetary damages, but he is suing the state or state and county officials in an *official* capacity. A suit against a government official in an official capacity is the same as suing the state and county themselves. *Will v. Michigan Dept. of State Police*, 491 US 58, 71 (1989). The only immunity potentially applicable to a governmental entity itself is sovereign immunity. *Kentucky v. Graham*, 473 US 159, 167 (1985). Claims for intentional discrimination under Title II of the ADA, when a fundamental liberty interest is at stake, abrogate sovereign immunity. *Tennessee v. Lane*, 541 U.S. 509 (2004). Therefore, there is no bar to the monetary damage claims against the State of Tennessee; The Dickson County General Session Court; the Dickson County Chancery Court; and, in their official capacities,

---

[2] Jane Doe is the only person sued individually; that claim is under state law.

Case: 19-6019    Document: 8    Filed: 10/28/2019    Page: 13

Judge Monsue and Judge Wolfe for intentionally discriminatorily depriving the John Doe and his three children of their fundamentally protected relationships, on the basis of John Doe's disability.

## III.    THE AMENDED COMPLAINT LAYS A PRIMA FACIA CASE AS TO ALL REMAINING CLAIMS.

In the district court, no one except the now-dismissed parties, filed any true challenge on the merits of any individual claims.  However, failure to state a claim upon which relief can be granted may be raised at any time before a trial on the merits.  *Kontrick v. Ryan,* 540 U. S. 443, 459 (2004).  It is also well-settled, subject matter jurisdiction is never waived.

### A.    The statute does not clearly permit deprivation of the parent child relationship by protective order and such an interpretation is counter to the protections afforded by other statutes.

As a matter of statutory interpretation, there is no state law authority for a protective order "no contact" provision between parent and child.  State law authority poses a matter of subject matter jurisdiction, ripe for collateral attack.  Statutory construction is a question of law. *Gleaves v. Checker Cab Transit Corp.,* 15 S.W.3d 799, 802 (Tenn. 2000); *Myint v. Allstate Ins. Co.,* 970 S.W.2d 920, 924 (Tenn. 1998). The primary goal of statutory interpretation is to carry out legislative intent without broadening or restricting the statute beyond its intended scope. *Houghton v. Aramark Educ. Res., Inc.,* 90 S.W.3d 676, 678 (Tenn. 2002). In construing legislative enactments, the presumption is that every word in a statute has meaning and purpose and should be given full effect if the obvious intention of the General Assembly is not violated by so doing. *In re C.K.G., 173 S.W.3d 714, 722* (Tenn. 2005). When a statute is clear, the plain meaning applies, without complicating the task. *Eastman Chem. Co. v. Johnson, 151 S.W.3d 503,*

*507 (Tenn. 2004).* The obligation is simply to enforce the written language. *Abels ex rel. Hunt v. Genie Indus., Inc.*, 202 S.W.3d 99, 102 (Tenn. 2006). It is only when a statute is ambiguous that a court may reference the broader statutory scheme, the history of the legislation, or other sources. *Parks v. Tenn. Mun. League Risk Mgmt. Pool,* 974 S.W.2d 677, 679 (Tenn. 1998). Further, the language of a statute cannot be considered in a vacuum, but "should be construed, if practicable, so that its component parts are consistent and reasonable." *Marsh v. Henderson*, 221 Tenn. 42, 424 S.W.2d 193, 196 (1968). Any interpretation of the statute that "would render one section of the act repugnant to another" should be avoided. *Tenn. Elec. Power Co. v. City of Chattanooga*, 172 Tenn. 505, 114 S.W.2d 441, 444 (1937).

A state protective order court has jurisdiction over the parties' children, but the issue is what the state domestic abuse protective order court *can and cannot* order regarding the respondent's minor children.  Tenn. Code Ann. § 36-3-606(a)(1), indicates a Protective Order may include a provision:

> "Directing the respondent to refrain from committing domestic abuse, stalking or sexual assault or threatening to commit domestic abuse, stalking, or sexual assault against the petitioner or the *petitioner's minor children.* "

(emphasis added).  However, the General Assembly expressly omitted the words "minor children" from the "no contact" statutory provision. Tenn. Code Ann § 36-3-606(a)(2), *to wit:*

> "Prohibiting the respondent from coming about the petitioner for any purpose, from telephoning, *contacting,* or otherwise communicating with the petitioner, directly or indirectly."

(emphasis added). Such an omission of the words "petitioner's minor children" in the "no contact" subdivision must be considered intentional.  Furthermore, the general statement at the

outset of Tenn. Code §36-3-606(a)[3] cannot permit the state court to do contrary to the specific provisions therein. Implying authority to enter an order of "no contact" with the Petitioner's minor children is repugnant to the express provision therein allowing the protective order court to make a custody determination. Tenn. Code §36-3-606(a)(6).

Further, a "no contact" order in a protective order proceeding is repugnant to the rest of Tenn. Code Title 36, as well as Tenn. Code Title 37. A criminally convicted physical or sexual child abuser is statutorily entitled to supervised visits and an abandoning parent may have restricting residential time. Tenn. Code. Ann. § 36-6-101(a)(2)(A). Further, jurisdiction over abused or allegedly abused children is the *exclusive* realm of the juvenile courts in Tennessee. Tenn. Code Ann. § 37-1-103(a)(1) & § 37-1-120(b)13(g). In fact, if a state court determining custody matters suspects child abuse, the statutes direct that court to refer it to juvenile court, which the provides significant more protections and for the representation of the children's interests. Tenn. Code Ann. § 36-6-106(a)(11). §37-1-114; 37-1-117(b); 37-1-126(a); 37-1-128(c). Tenn. Code. Ann. §37-1-101. It is inconceivable that the General Assembly could have intended for Jane Doe to end-run the juvenile court system by seeking a protective order under Title 36 Ch. 6, instead of filing a child abuse petition under Title 37.

**B. In the alternative, the state law allowing protective order "no contact" provisions with the minor children is void for vagueness or insufficient procedural due process, under the 14th Amendment to the U.S. Constitution.**

As if the statutory basis for a "no contact" provision was not shaky enough, the constitutional footing is a mere scintilla. Even if there is some implied authority, it is not apparent on the face of the statute, thus the statute is unconstitutionally vague. In addition, the

---

[3] "A protection order granted under this part to protect the petitioner from domestic abuse, stalking, or sexual assault may include, but is not limited to…" Tenn. Code. Ann. §36-6-606(a).

statute, and the courts in practice, provide insufficient procedural due process in infringing the Plaintiffs' parent-child fundamental liberty interests.

**1.) The statute is unconstitutionally vague.**

The Due Process Clause of the 14th Amendment protects against laws which are too vague to provide notice of prohibited conduct and standards of enforcement. *Grayned* v. *City of Rockford*, 408 U. S. 104, 108-109 (1972). Specifically:

> "Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly...Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory applications"

*Id. See also, Village of Hoffman Estates v. Flipside*, 455 U.S. 489, 498 (1982). While the standard is more stringent in the criminal law context, it applies to non-criminal matters, as well. *Flipside*, 455 U.S. at 498-99. In addition, laws threatening to interfere with Constitutionally protected rights are subject to a more stringent test for vagueness. *Id.* at 499.

There is no notice given in Tennessee law as to what acts constitute domestic violence warranting a protective order including a "no contact" provision *with the minor children,* let alone an explicit statement that such an outcome is possible. There are no factors or analysis present in the statute for an order of "no contact" with the minor children, such that one can determine whether respondents get a "no contact" order with their children or a visitation or custody order under Tenn. Code § 36-3-606(a)(6).

If Tenn. Code §36-3-606, by the phrase, "A protection order granted under this part to protect the petitioner from domestic abuse, stalking or sexual assault may include, but is not

limited to..." permits the protective order court to sever the constitutionally protected fundamental liberty interest of the parent-child relationship, it could also arguably permit summary execution of the respondent.

### 2. The state procedure provides insufficient procedural due process in depriving Plaintiffs of their parent-child and child-parent rights.[4]

It is well-settled that parental rights are fundamental liberty interests protected by the U.S. Constitution. *See e.g. Michael H. v. Gerald D.,* 491 U.S. 110, 122-124 (1989*). See also Stanley v. Illinois,* 405 U.S. 645, 651 (1972). Federal Courts of Appeals for the Second and Seventh Circuit, have clearly articulated the reciprocal fundamental liberty interest of the child in the parent-child relationship. *Duchesne v. Sugarman,* 566 F.2d. 817, 825 (2d Cir. 1977)("This right to the preservation of family integrity encompasses the reciprocal rights of both parent and children. It is the interest of the parent in the 'companionship, care, custody and management of his or her children.'"); *see also Doe v. Heck,* 327 F.3d 492, 518 (7th Cir. 2003) ("Equally fundamental is the right of a child to be raised and nurtured by his parents"). The Fourth Circuit Court of Appeals has clearly articulated the interest of the child, while avoiding legal recognition of a fundamental liberty interest. *Jordan by Jordan v. Jackson,* 15 F.3d 333, 343 (4th Cir. 1994)("The bonds between parent and child are, in a word, sacrosanct"). However, the Supreme Court appears to have yet to weigh in on the matter of reciprocal child rights. *Michael H. v. Gerald D.,* 491 U.S. 110, 130 (1989).

The procedural due process analysis considers the amount of due process due under the circumstances, taking into consideration the type of interest at stake, with the highest protections afforded to fundamental liberty interests; the risk of wrongful deprivation; and the government's

---

[4] There is no challenge herein to the constitutionality of the order of protection procedure as it applies solely between the petitioner and the respondent. The due process challenge is only as it relates to the due process involved regarding respondent and the parties' children.

interest. *Matthews v. Eldridge*, 424 U.S. 319, 333 (1976). The courts have held a recipient is entitled to a pre-termination hearing, ranging from a phone call to a formal hearing, depending on the circumstances, before stopping welfare benefits, terminating employment, or non-academic suspension or termination of school enrollment. *See generally, Goldberg v Kelly,* 397 U.S. 254 (1970); *Cleveland Bd. of Ed. v. Loudermill,* 470 U.S. 532, 5454 (1985); *Goss v. Lopez,* 419 U.S. 565 (1975).

Procedural due process protections may include a heightened burden of proof, to a clear and convincing standard. *Santosky et al. v. Kramer,* 455 U.S. 745, 747-48 (1982). At an order of protection hearing, under Tennessee law, the burden of proof is a mere preponderance of the evidence. Tenn. Code § 36-3-605(b). Due process also requires procedures that reduce risk of wrongful deprivation, as opposed to "imprecise substantive standards unusually open to subjective values that leave determinations unusually open to the values[5] of the judge." *Id. at* 762. In addition, appointment of counsel for indigent parties may be a due process consideration. *Lassiter v. Dept. of Soc. Services of Durham County,* 452 U.S. 18 (1981).

Perhaps the clearest due process issue is that Johnson Doe I, II, & III 's due process rights were clearly violated, as their interests were not represented at all. Tenn. Code Title 36, Chap. 3-Pt. 6, affords no opportunity for the children to be heard or their best interests represented at any stage of the protective order proceeding. "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Matthews v. Eldridge,* 424 U.S. 319, 333 (1976), *citing Armstrong v. Manzo,* 380 U. S. 545, 552 (1965).

For these reasons, the state protective order process provided insufficient procedural due process to John Doe and Johnsons Doe I, II, & III before severing their parent-child rights.

---

[5] "Values" is putting it nicely, as it also leaves it open to the judge's "discrimination, ignorance, or bias."

**C. The Courts of Tennessee can not require an allegedly disabled person to bear or front the costs of evaluations to determine the effect their disabilities have on their parenting, as the regulations enacted under Title II of the ADA bars such disability surcharges.**

Title II of the ADA prohibits imposing a surcharge on a disabled person for measures to allow them to participate in the entity's activity. 28 C.F.R. §35.130 (f). Whether the cost should be borne by the party alleging a parent's disability poses a threat (the party that should have the burden of proof) or borne by the state is of no matter here, but under no circumstances should the disabled parent be put in the position of having to pay considerable costs, due to their disability.

To have an equal opportunity to parent on an equal footing with the parent making the allegations of disability, the Rule 35 evaluation is ordered of the disabled (or regarded as disabled) person. This exam is only ordered on those who are disabled or regarded as such. This clearly meets the criteria laid out in *Dare v. California*, 191 F.3d 1167, 1171 (9th Circuit 1999). Furthermore, the state court ordering the disabled parent to pay for supervised visits is also a surcharge.

**D. Title II of the ADA prohibits discrimination on the basis of a disability in making custody decisions, unless the parent poses a true threat. Tennessee law and the State Judicial Defendants are in violation of this prohibition, as alleged in Claims 4-7**

Title II of the American with Disabilities Act clearly applies in the administration of family law, as noted by the joint guidance issued by Health and Human Services and the Department of Justice. "Protecting the Rights of Parents… With Disabilities…" Dated August 2015, Doc #23-1, PageID# 278-295. Such a document is entitled to deference. *Chevron U.S.A.,*

*Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844 (1984); *see also Bragdon v. Abbott*, 524 U.S. 624, 646 (1998) (applying *Chevron* deference to DOJ's interpretation of ADA Title III); *Civic Ass'n of the Deaf of New York City, Inc. v. Giuliani*, 915 F. Supp. 622, 635 (S.D.N.Y. 1996);*Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 597-98 (1999). *See also* 42 U.S.C. § 12206(a)(1); (c)(1); (c)(2)(B)(i); (c)(3); *see also,* 28 C.F.R. § 35.190(a).

Title II of the ADA prohibits a government entity, such as a court, from discrimination based upon a disability. 42 U.S.C. §12131 & 12132. However, Tenn. Code § 36-6-108 does just that, allowing a Tennessee court determining custody to consider a parent's disability. The state statute is in clear and direct conflict with federal law. *Compare* Tenn. Code § 36-6-108; *with* 42 U.S.C. §12131 & 12132, *see also* 28 C.F.R. § 35.139(a), 35.130(b)(3) & (h). The state law cannot stand as it is. John Doe has pled an alternate theory of statutory saving construction, but that is of little matter at this juncture.

Hon. David Wolfe's intentionally disregarded the ADA. This disregard impacts not only John Doe, but Johnson Doe I, II, and III, who due to Hon. David Wolfe's discrimination, were deprived of their father. The ADA protects persons discriminated against because of their association with someone with a disability. 28 C.F.R. 35.130(g). *A Helping Hand, LLC v. Baltimore County,* 515 F.3d 356 (4th Cir. 2008) (based on its association with addicted persons it served, methadone clinic could bring ADA claim for injuries from zoning decisions); *Doe v. County of Centre,* 242 F.3d 437 (3d Cir. 2001) (adoptive parents of child with HIV could sue to challenge policy restricting foster placements in households that include person with HIV).

**E. John Doe properly seeks to require the State of Tennessee to take a verbatim record of all hearings in "courts of record" as a logical extension of existing case law (Claim #10).**

Circuit Courts of Appeals have noted that, as a matter of 14th Amendment due process, parties may be permitted to audio record a proceeding or that the government body may be required to take a verbatim record of some proceedings, either by court reporter or audio recording. *Flaim v. Medical College of Ohio*, 418 F.3d 629, 636 (2005). .(Student may audio record disciplinary hearing); *Singh v. Holder*, 638 F. 3d 1196, 1208 (9th Cir 2011)(immigration administrative hearings must be recorded by BIA). This Circuit previously specifically that in some contexts the government could be required to make the contemporaneous verbatim recording of proceedings. *Flaim*, 418 F.3d at 629.

Based on this precedent, John Doe asserts due process *requires* the State to record all court appearances in the Chancery and Circuit Courts in the State of Tennessee, the memorialization of which shall be made available to the public, with the State able to charge for transcripts or copies. This is not about free transcripts, as the district court tried to re-cast the claim. *But see* PageID #716. It is simply unconscionable that a state court litigant should have to arrange for the appearance and payment of their own court reporter for the purposes of ensuring creation of a verbatim record of the proceeding, which is a basic foundation of due process.

**IV.　　UPON REMAND THIS MATTER MUST BE REASSIGNED.**

Appellant seeks an order reassigning this matter based on judicial recusal or the Court's supervisory jurisdiction.

**A.  The District Court judge was required to recuse himself, and the Court must require his removal, as his impartiality might reasonably be questioned**

Hon. Judge William Campbell Jr.'s spouse is employed as the head of the state legal office giving counsel to the Tennessee General Assembly.  In this role, the advice of Mrs. Campbell and her office to the General Assembly and its members is confidential and not available to public view.  Apparently, Judge Campbell believes that he need only inquire of his wife if she worked on a particular statute directly previously and if the answer is no he can proceed on a case.  His view is far too narrow and fails to consider the broader picture.

Mrs. Campbell's work is confidential under state law. Tenn. Code 3-12-105(a)(2).  Therefore, Judge Campbell's method of conflict determination requires him to approach his wife and identify matters before his court, seeking confidential information about her job.

Mrs. Campbell's work is apparently as a supervisor, whether she handled certain matters directly or she supervises the attorney that did is indistinguishable.  In her role, Mrs. Campbell arguably has an obligation to notify the General Assembly if she has become aware that one of their enactments may be unconstitutional or that her office's prior advice was in error or potential error.  Further, she may be called on in the future to draft correcting legislation after a successful challenge in federal court to a Tennessee law.  In addition, given his wife's role in the Tennessee legislature, a decision critical of state law or state practice, such as that sough in this case could create a hostile work environment for Judge Campbell's wife.

For these reasons, Judge Campbell should not hear a case involving a Tennessee statute, or rule made pursuant to statute, so long as his wife continues to be employed for the Tennessee General Assembly.  In addition, upon his wife ceasing to be employed in such capacity, he still should not hear cases involving statutes enacted during her tenure with the General Assembly.

Anything less creates a reasonable question of the judge's impartiality under 28 U.S.C. §455. His failure to recuse himself is in error.

**B. In the Alternative, the District Court Handling of this Case Lends Itself to Re-Assignment under this Court's Supervisory Authority, in the Interests of Justice.**

Regardless of any requisite for a recusal or removal, this Court has supervisory authority to direct the district's chief judge to re-assign a case on remand within the originating district. In this instance, the district court, both the district judge and the magistrate, engaged in a practice of applying a narrow exception broadly to dismiss John Doe's case, implying facts to support dismissal, misconstruing John Doe's claims, and acting without due speed.

At a minimum, re-assignment for supervisory purposes is required. While reassignment within the district is certainly a reasonable option, John Doe believes that assignment to a judge from another district may be warranted, under 28 U.S.C §292 (b).

## Conclusion

For all these reasons, the cause of John Doe and his children should be reinstated, the judgment of dismissal of the Middle District of Tennessee reversed, and the case remanded.

Respectfully Submitted,
October 24, 2019

John Doe, *Pro Se*

*Johndoeplainitff@gmail.com*

24



RESS FIRMLY TO SEAL

PRIORITY MAIL
FLAT RATE
POSTAGE REQUIRED

Retail

**US POSTAGE PAID**
**P**
**$7.35**
Origin: 37228
10/24/19
4761550204-17

**PRIORITY MAIL 2-DAY ®**

0 Lb 5.70 Oz
**1006**

EXPECTED DELIVERY DAY: 10/26/19

C023

SHIP
TO:
100 E 5TH ST
RM 540
CINCINNATI OH 45202-3945

**USPS TRACKING NUMBER**

9505 5141 3691 9297 5091 65

• Date of
• USPS TR
  internatic
• Limited in
• Pick up a
• Order sup
• When use
  declaration label may be required.

* Domestic only

P S00001000014

EP14F Oct 2018
OD: 12 1/2 x 9 1/2

RECEIVED

OCT 2 8 2019

DEBORAH S. HUNT, Clerk

**PRIORITY**
★ **MAIL** ★

**UNITED STATES**
**POSTAL SERVICE ®**
VISIT US AT USPS.COM®
ORDER FREE SUPPLIES ONLINE

FROM:
John Doe
C/s Carmel Rridus
103 Cypress Ct
WH, TN 37188

TO:  Clerk of 6th Cr. Gtbldg.
     100 E Fifth St #540

     Cincinnati, OH 45202-
                        3988

To schedule free
Package Pickup,
scan the QR code.

**USPS.COM/PICKUP**

Label 228, March 2016

FOR DOMESTIC AND INTERNATIONAL USE

* Domestic only.    ** For Domestic shipments, the maximum weight is 70 lbs. For international shipments, the maximum weight is 4 lbs.